Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/27/2020 12:09 AM CST

State of Nebraska on behalf of Tina K., as
mother and next friend of Destiny B., a minor
child, appellee, v. Adam B., third-party
plaintiff, appellee, Tina K., third-party
defendant, appellant, and Jo K.,
intervenor-appellee.

___ N.W.2d ___

Filed September 4, 2020.    No. S-19-448.

1. **Constitutional Law: Parental Rights.** Parents have a fundamental right to make decisions concerning the care, custody, and control of their children that is constitutionally protected.
2. **Constitutional Law: Parent and Child.** Establishment and continuance of the parent-child relationship is the most fundamental right a child possesses to be equated in importance with personal liberty and the most basic constitutional rights.
3. **Child Custody: Parent and Child: Presumptions.** The parental preference principle establishes a rebuttable presumption that the best interests of the child are served by placing custody of a minor child with his or her parent.
4. **Child Custody: Parental Rights: Proof.** Under the parental preference principle, absent proof that a parent is unfit or has forfeited the right to custody, a parent may not be deprived of the custody of a minor child.
5. **Child Custody: Parental Rights.** While the best interests of the child remain the lodestar of child custody disputes, a parent's superior right to custody must be given its due regard, and absent its negation, a parent retains the right to custody over his or her child.
6. **Parent and Child: Words and Phrases.** Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being.

7. **Parent and Child: Evidence.** Evidence of parental unfitness should be focused upon a parent's ability to care for a child, and not any other moral failings a parent may have. Evidence of a parent's past failings is pertinent only insofar as it suggests present or future faults.

8. **Parental Rights.** Parental rights may be forfeited by substantial, continuous, and repeated neglect of a child and a failure to discharge the duties of parental care and protection.

9. **Child Custody: Parental Rights: Proof.** Clear and convincing evidence of substantial, continuous, and repeated neglect of a child must be shown in order to overcome the parent's superior right.

10. **Child Custody: Parental Rights.** Allowing a third party to take custody, even for a significant period of time, is not the equivalent to forfeiting parental preference.

11. **Parent and Child.** In loco parentis status is not equivalent to status as a parent.

12. ____. In loco parentis status does not entitle a person to all the same rights that a legal parent would enjoy.

13. ____. In loco parentis status does not, by itself, eclipse the superior nature of the parental preference accorded to biological or adoptive parentage.

14. **Parental Rights: Proof.** In order for exceptional circumstances to negate the parental preference principle, there must be proof of serious physical or psychological harm to the child or a substantial likelihood of such harm.

Appeal from the District Court for Lancaster County: JODI L. NELSON, Judge. Reversed and remanded for further proceedings.

Mary C. Byrd, of Byrd & Greve Law, L.L.C., for appellant.

Matthew P. Saathoff and Donald E. Loudner III, of Saathoff Law Group, P.C., L.L.O., for intervenor-appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

CASSEL, J.

## INTRODUCTION

After finding a child's mother to be a fit parent, the district court found that parental preference was negated based on the child's best interests and awarded custody to an individual

standing in loco parentis. We refine our standard for an exceptional case where a child's best interests can negate the parental preference principle. Because the district court did not have the benefit of this articulation, we reverse, and remand for reconsideration under the proper standard.

## BACKGROUND

### Prior Proceedings

In 2006, the State filed a complaint to establish paternity and support of Destiny B., a child born in July 2003 to Tina K. and Adam B. In March 2006, the State obtained a default order against Adam.

In November 2007, Adam filed an application to modify the default order. He alleged that it did not determine Destiny's custody and that a material change of circumstances had occurred because she was in Adam's custody. The court entered an ex parte temporary custody order in favor of Adam. In February 2008, the court entered an order, pursuant to Adam's and Tina's stipulation, which awarded Adam physical custody of Destiny and provided Tina with supervised visitation.

In October 2011, Tina filed a complaint to modify child custody. She alleged that Destiny had been with her for nearly a month while Adam was without a permanent residence. Adam consented to entry of a temporary order; thus, the court awarded Tina temporary custody of Destiny. In January 2013, the court dismissed Tina's complaint for want of prosecution.

### Current Proceeding

In January 2017, Tina filed a complaint to modify. She alleged that a material change of circumstances had occurred since the February 2008 order. Specifically, Tina alleged that Destiny had not lived with Adam since 2011, that Destiny lived exclusively with Tina from September 2011 to the beginning of 2014, and that Destiny had lived with Jo K., with frequent visitation by Tina, since 2015. Tina sought to be awarded sole physical custody.

In August 2017, after being allowed to intervene, Jo filed a complaint. Jo alleged that she was Destiny's primary caretaker, that she stood in loco parentis over Destiny, and that Destiny had been in her custody since February 2014 with the consent of Adam and Tina and pursuant to valid temporary delegations of parental powers. Jo's complaint did not specifically request custody of Destiny, but she sought to intervene in order to "seek relief regarding any other matter affecting or concerning the welfare and best interests of the minor child."

## Trial

In September 2018, a trial commenced on Tina's complaint to modify and Jo's complaint in intervention. At that time, Destiny was 15 years old.

Tina and Adam lived together for 7 to 8 months after Destiny's birth. According to Tina, Adam then moved out of Tina's apartment and Destiny remained with Tina until 2008. On the other hand, Adam testified that he was Destiny's primary parent from her birth until 2010 and that Tina rarely spent time with Destiny when she was between the ages of 2 and 10.

Adam testified that Tina used drugs before and after Destiny's birth. He observed Tina to be under the influence of methamphetamine many times over a significant period of time. In 2008, when Destiny was almost 5 years old, Tina was convicted of attempted delivery of a controlled substance. Adam obtained custody of Destiny at that time. While Tina served her sentence, she did not see Destiny but mailed letters weekly to stay in touch.

According to Adam, Tina was Destiny's primary parent from 2010 to 2013. In September 2011, Tina and Destiny moved to Lincoln, Nebraska. Tina enrolled Destiny in school, located a doctor and dentist for her, and took care of all of Destiny's needs. Destiny's school records showed that she had a significant number of absences while attending school in Lincoln.

In early 2013, Tina was using and selling methamphetamine. Although Destiny was in Tina's custody at the time, Destiny

was not present when Tina was actively selling drugs. Tina stopped using and selling drugs in April, when she suspected she was pregnant.

Tina was convicted of attempted delivery of a controlled substance in connection with a March 2013 drug transaction. She began serving her sentence in February 2014 and planned for Destiny to remain with the father of Tina's newborn child during her incarceration. However, Adam removed Destiny after approximately 3 weeks. He arranged for Destiny to live with Jo, an "old family friend" whom Tina had known for over 25 years.

While incarcerated, Tina kept in communication with Destiny. Jo brought Destiny to the prison for visitation with Tina every other week. On a weekly basis, Tina wrote letters to Destiny and spoke on the telephone with her. Tina was incarcerated until November 2014 and then was on work release until January 2015.

Upon release, Tina recognized she lacked stability and therefore did not immediately seek Destiny's return. Tina explained that she needed housing and money. And Tina acknowledged that Destiny was doing well in Jo's care. But Tina testified that since her release in January 2015, she had seen Destiny four times a month, and that Destiny typically would spend the night with Tina every other weekend or every third weekend.

By June 2015, Tina had obtained employment and a residence. That summer, Tina told Jo that she wanted Destiny to live with Tina. According to Tina, Jo was receptive to the idea, as long as Tina was "working and everything was stable and [Tina] was on [her] feet." But Tina was living in a one-bedroom apartment, and she wanted a larger residence so Destiny would have her own bedroom. In May 2016, Tina saved enough money for a two-bedroom apartment. In the summer, Tina again broached the subject with Jo of having Destiny back in Tina's care. Jo responded that Tina "needed to do it legally." Tina then saved money to hire attorneys. Tina believed that she was now a fit and stable parent who could provide for Destiny's needs.

In the summer of 2017, Tina picked up Destiny and "just was going to keep her." She informed Jo after the fact. That night, Jo and Adam went to Tina's apartment to get Destiny. After that incident, Jo's demeanor toward Tina changed. Jo did not want Tina to see Destiny and wanted visits to be supervised. Prior to being incarcerated, Tina had a close relationship with Jo. But Tina testified that at the time of trial, she had a strong dislike for Jo because "nobody asked Jo to step in when she wasn't needed and take Destiny."

With regard to parenting time with Destiny, Tina testified that sometimes she and Jo met, sometimes Tina picked up Destiny, and sometimes Tina had someone else pick up Destiny. Tina's car was unreliable and did not have license plates. During trial, Tina bought a different car. She explained, "Well, it seemed like it would be a — a big deal that I didn't have transportation; so I just wanted to make sure . . . I can provide transportation."

Jo testified that she has "always been in [Destiny's] life" and that her level of involvement increased as Destiny aged. Tina and Destiny lived with Jo from November 2013 until mid-February 2014. For the past 5 years, Jo made all of the decisions regarding Destiny's upbringing, care, education, and medical treatment. Tina agreed that Jo has stood in loco parentis. Tina's proposed parenting plan provided for visitation with Jo. She believed it would be in Destiny's best interests to continue to have a relationship with Jo and supported such a relationship.

There was no dispute that Destiny is involved in activities in Gretna, Nebraska, where she lives with Jo, and that her life is established there. Jo testified that Destiny has many friends in the Gretna area and that she is well-bonded to a lot of her friends. Jo worried about stability and routine for Destiny if she returned to Lincoln.

Tina testified that she would change Destiny's school if she obtained custody. Adam believed that Destiny wanted to graduate from high school in Gretna rather than change schools again. He explained that in Lincoln, Destiny "jumped

from school to school to school," but that now she has stability and "she needs to continue that stability until she's an adult." According to Adam, Destiny achieved placement on the honor roll within 6 months of being in the Gretna school system and had maintained that honor.

Adam did not want Tina to have custody of Destiny and wished to have Destiny continue being parented by Jo. Adam thought it would be traumatic to Destiny to uproot her.

In April 2014, Jo arranged for Destiny to have counseling with Joanie Hansen, a licensed independent mental health care practitioner. Hansen testified that she typically would see Destiny once a week, sometimes twice a week if Destiny had a weekend with Tina. When therapy began, Destiny was lying, stealing, and cheating. Destiny's grades in school were poor, with some of them being failing, and she had difficulty concentrating. Destiny also was having angry outbursts. Hansen testified that Destiny was frustrated with her parents and had been acting out in frustration. With Jo, Destiny had a stable home, rules, and guidelines. Hansen observed positive changes over the 4 years she worked with Destiny. Destiny would no longer steal or lie, and her grades had improved.

Hansen testified that Destiny is a "people pleaser." Destiny told Hansen that "she has to tell her mom that she wants to live [with Tina] or she'll get yelled at, because any time she disagrees with her mom, her mom yells at her." Within the month before trial, Destiny had told Hansen that she wanted to live in Gretna but Destiny was too scared to tell Tina. Hansen testified that Destiny had consistently said she wanted to live in Gretna with Jo, but on cross-examination, Hansen testified that Destiny wavered back and forth regarding where she wanted to live, which Hansen attributed to guilt. She explained that Destiny would say she wanted to live in Gretna but that doing so would upset Tina.

Hansen testified that Destiny would be frustrated and angry after spending a weekend with Tina and that it would take Destiny a couple of days to adjust. Hansen had observed Destiny to be more despondent, depressed, and agitated after

a visit with Tina. On the other hand, when Destiny would have weeks without a weekend with Tina, Destiny would be stable and secure.

Hansen feared that the therapeutic relationship would be discontinued if Destiny moved to Lincoln and that such discontinuation would be detrimental to Destiny. Tina testified that she had the ability to transport Destiny to see Hansen on a regular basis and that "no matter what happens, I'd always like Destiny to continue care with her." Hansen also believed it would be detrimental to move Destiny from the Gretna school system, because Destiny was well established and was in high school. She believed it was in Destiny's best interests to remain in Gretna with Jo.

The parties agreed not to call Destiny as a witness, and Jo's counsel offered into evidence Destiny's deposition. Although we have considered Destiny's testimony, we will not summarize the contents of the confidential deposition. The record shows that Destiny's deposition was taken at Hansen's office and that by stipulation, neither Jo nor Tina were to attend. But Hansen testified that Tina was "there" when Destiny arrived. According to Hansen, "they were kind of yelling in the parking lot." Hansen could not hear what was said and had "no idea what they were talking about." Hansen testified that Destiny was "uptight" at the beginning of the deposition, and Hansen was "not sure if that had to do with the parking lot encounter."

### Trial Court's Decision

In April 2019, the court entered an extensive order of modification. It accepted Adam's testimony that Destiny remained with him when he moved out of Tina's residence while Destiny was an infant. The court noted two material changes in circumstances: Jo's standing in loco parentis to Destiny and Adam's admission that he was not in a position to be the custodial parent.

The court acknowledged the parental preference doctrine. The court stated that there was a presumption in favor of

Adam or Tina over Jo "unless it is shown that the lawful parent is unfit or has forfeited his or her superior right *or the preference is negated by a demonstration that the best interests of the child lie elsewhere*." (Emphasis in original.) The court reasoned that Adam had generally forfeited his superior right in favor of Jo.

The court determined that Tina was now a fit person to care for Destiny. The court recognized that Tina had attained more stability in her life. But the court stated that its paramount concern was Destiny's best interests. The court found that "parental preference in favor of [Tina] is negated by the overwhelmingly clear and convincing evidence that Destiny's best interest is for her to remain with [Jo]." The court described the situation as "one of those rare instances" when the best interests of a child defeat the parent's preference. The court placed legal and physical custody with Jo, set parenting time for Adam and Tina, and determined child support.

Tina timely appealed, and we moved the case to our docket.[1] As authorized by court rule, we submitted the case without oral argument.[2]

## ASSIGNMENT OF ERROR

Tina assigns that the court abused its discretion by awarding custody to Jo rather than to Tina.

## STANDARD OF REVIEW

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.[3]

## ANALYSIS

[1-4] Parents have a fundamental right to make decisions concerning the care, custody, and control of their children

---

[1] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2018).

[2] See Neb. Ct. R. App. P. § 2-111(B)(1) (rev. 2017).

[3] *Eric H. v. Ashley H.*, 302 Neb. 786, 925 N.W.2d 81 (2019).

that is constitutionally protected.[4] Establishment and continuance of the parent-child relationship is the most fundamental right a child possesses to be equated in importance with personal liberty and the most basic constitutional rights.[5] In recognition of this important relationship, the parental preference principle establishes a rebuttable presumption that the best interests of the child are served by placing custody of a minor child with his or her parent.[6] Under the parental preference principle, absent proof that a parent is unfit or has forfeited the right to custody, a parent may not be deprived of the custody of a minor child.[7]

[5] While the best interests of the child remain the lodestar of child custody disputes, a parent's superior right to custody must be given its due regard, and absent its negation, a parent retains the right to custody over his or her child.[8] In *Windham v. Griffin*,[9] we touched on the relationship between the parental preference principle and the best interests standard. We stated, "While preference must be given to a biological or adoptive parent's superior right to custody where the parent is not unfit and has not forfeited his or her parental rights, a court also considers the child's best interests in making its custody determination."[10] Significantly, we characterized cases where best interests of the child defeated parental preference as being "exceptional."[11]

[6,7] Turning to the instant case, we begin with consideration of Tina's fitness as a parent. The district court found

---

[4] See *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

[5] *Uhing v. Uhing*, 241 Neb. 368, 488 N.W.2d 366 (1992).

[6] *In re Guardianship of K.R.*, 304 Neb. 1, 932 N.W.2d 737 (2019).

[7] *Id.*

[8] *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004).

[9] *Windham v. Griffin*, 295 Neb. 279, 887 N.W.2d 710 (2016).

[10] *Id.* at 290, 887 N.W.2d at 718.

[11] *Id.*

that she was a fit parent, and Jo does not challenge that finding. Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being.[12] Evidence of parental unfitness should be focused upon a parent's ability to care for a child, and not any other moral failings a parent may have.[13] Evidence of a parent's past failings is pertinent only insofar as it suggests present or future faults.[14] The evidence showed that at the time of trial, Tina had a residence and employment, was not using or selling drugs, and was actively involved in Destiny's life. Upon our de novo review, we agree with the court that Tina "is now a fit person to care for Destiny."

[8-10] Next, we consider forfeiture. The district court did not explicitly make a finding as to whether Tina forfeited her superior right to custody, but implicit in its decision is that she did not. Parental rights may be forfeited by substantial, continuous, and repeated neglect of a child and a failure to discharge the duties of parental care and protection.[15] Clear and convincing evidence of such neglect must be shown in order to overcome the parent's superior right.[16] And we have stated that allowing a third party to take custody, even for a significant period of time, is not the equivalent to forfeiting parental preference.[17] Under our jurisprudence, we agree that the evidence does not establish forfeiture by Tina of her parental preference.

---

[12] *In re Guardianship of K.R., supra* note 6.

[13] See *In re Interest of Lakota Z. & Jacob H.*, 282 Neb. 584, 804 N.W.2d 174 (2011).

[14] *Id.*

[15] *Windham v. Griffin, supra* note 9.

[16] See *Farnsworth v. Farnsworth*, 276 Neb. 653, 756 N.W.2d 522 (2008).

[17] See *Windham v. Griffin, supra* note 9.

[11-13] It is important to differentiate Jo's status from Tina's status as a biological parent. It is undisputed that Jo stood in loco parentis to Destiny. In loco parentis is a common-law doctrine that gives standing to a nonparent to exercise the rights of a natural parent when the evidence shows that the nonparent's exercise of such rights is in the child's best interests.[18] In order to stand in loco parentis, one must assume all obligations incident to the parental relationship.[19] But in loco parentis status is not equivalent to status as a parent.[20] Such status does not entitle a person to all the same rights that a legal parent would enjoy.[21] In loco parentis status does not, by itself, eclipse the superior nature of the parental preference accorded to biological or adoptive parentage.[22] We recently noted that *Windham* rejected an invitation to view the parent and nonparent as being on equal footing and to determine custody by reference to best interests alone.[23] Thus, Tina retains a superior right to custody of her child as compared to Jo.

Here, the district court found that the parental preference was negated by evidence that it was in Destiny's best interests to remain with Jo. In so finding, that court emphasized our language in *Windham* that the parental preference could be "negated by a demonstration that the best interests of the child lie elsewhere."[24] But in *Windham*, we did not articulate a standard for when the best interests of a child lie elsewhere. Instead, we stated that "[a]lthough we are aware of instances where courts have determined that the best interests of the

---

[18] *Jennifer T. v. Lindsay P.*, 298 Neb. 800, 906 N.W.2d 49 (2018).

[19] *Id.*

[20] *Whilde v. Whilde*, 298 Neb. 473, 904 N.W.2d 695 (2017).

[21] See *id.*

[22] *Jennifer T. v. Lindsay P., supra* note 18.

[23] See *In re Guardianship of K.R., supra* note 6.

[24] *Windham v. Griffin, supra* note 9, 295 Neb. at 288, 887 N.W.2d at 717.

child defeated the lawful parent's preference, we view these cases as exceptional."[25]

[14] Although *Windham* did not articulate a standard for the exceptional case, we cited a New Jersey case[26] therein that did so. In *Watkins v. Nelson*,[27] the New Jersey Supreme Court declared that the exceptional circumstances standard "always requires proof of serious physical or psychological harm or a substantial likelihood of such harm." The *Watkins* court explained that the standard was "designed to reduce or minimize judicial opportunity to engage in social engineering in custody cases involving third parties."[28] We agree with this articulation. We now refine our articulation in *Windham* to clarify that in order for exceptional circumstances to negate the parental preference principle, there must be proof of serious physical or psychological harm to the child or a substantial likelihood of such harm.

The district court relied on language in *Windham*, but it did not have the benefit of this refined standard. Thus, it is unsurprising that the court's order did not speak in terms of serious physical or psychological harm or a substantial likelihood of such harm. The court stated that it agreed with Hansen's conclusions that "it would be detrimental to move Destiny from Gretna and [Jo]" and that "it would be a serious undoing and one that Destiny might not be able to handle." But we cannot determine whether the court abused its discretion when it applied an incomplete and unrefined standard.[29]

Accordingly, we reverse, and remand for reconsideration under the elucidated standard for exceptional circumstances.

---

[25] *Id.* at 290, 887 N.W.2d at 718.

[26] *Watkins v. Nelson*, 163 N.J. 235, 748 A.2d 558 (2000).

[27] *Id.* at 248, 748 A.2d at 565.

[28] *Id.* at 252, 748 A.2d at 567.

[29] See, *Eric H. v. Ashley H., supra* note 3; *State v. McGuire*, 301 Neb. 895, 921 N.W.2d 77 (2018).

We leave to the district court's discretion whether to allow for the expansion of the existing record.

## CONCLUSION

When a fit parent has not forfeited his or her superior right to custody, the best interests of a child will negate the parental preference principle only in an exceptional case. We now clarify that an exceptional case requires proof of serious physical or psychological harm or a substantial likelihood of such harm. Because the district court did not have the benefit of this articulation, we reverse, and remand for further proceedings consistent with this opinion.

Reversed and remanded for further proceedings.

Freudenberg, J., concurring.

The district court based its placement decision upon a finding that this was one of those rare instances where a minor child's best interests weigh so heavily in favor of placement with a nonparent standing in loco parentis that it overcomes the presumption of the parental preference principle under *Windham v. Griffin*.[1] However, as the majority noted, cases where the best interests of the child defeated parental preference are exceptional when the court finds a parent fit and has not otherwise forfeited such parental preference. In the present case, the district court found the mother, Tina K., to be a fit parent. I disagree with the district court's parental fitness finding. However, it was not challenged on appeal.

I believe there was sufficient evidence based on a de novo review of the record to find Tina was unfit to parent her minor daughter, Destiny B. Tina's repeated criminal actions resulted in her inability to parent, and her lifestyle choices created an unhealthy and unstable living environment. The record in this matter sets forth Tina's significant lack of positive parenting

---

[1] See *Windham v. Griffin*, 295 Neb. 279, 887 N.W.2d 710 (2016).

functions as they are defined in Nebraska's Parenting Act, specifically, Neb. Rev. Stat. § 43-2922 (Reissue 2016).[2]

Destiny's father, Adam B., testified that Tina was using drugs both before and after Destiny was born in July 2003. Adam and Tina separated a few months later, and Adam retained custody. Other than a few letters and occasional visits, the record does not show that Tina attempted to support or care for Destiny until she sought visitation rights in 2008 after completing a prison sentence imposed due to a drug distribution conviction. Tina did not obtain custody at that time.

In 2011, Tina again moved to modify custody and was granted temporary custody of Destiny. However, the complaint to modify custody was subsequently dismissed for want of prosecution, which reverted custody back to Adam. Adam testified that he was unaware the complaint had been dismissed, so Destiny remained with Tina for a time. Approximately 3 years after taking custody of Destiny, Tina was again convicted and sentenced to incarceration for a drug distribution offense. Further, Tina testified that during the period she had custody of Destiny, she had become addicted to methamphetamines. The record demonstrates that Tina has only provided direct care and support for Destiny 3 of the 15 years of Destiny's life, and for at least 1 of those years, Tina was addicted to methamphetamines and engaging in the illegal distribution of controlled substances.

While Tina was completing her second relevant incarceration period, Destiny's father reached out to Jo K. and found Destiny a stable caretaker. Such placement appears to be the first time in Destiny's life that she was in a safe, stable, consistent, and nurturing setting. The record further establishes that with Jo's support, Destiny began to flourish and address some of the psychological issues she had developed during her earlier childhood. Both Adam and Tina acknowledged that Jo had been the only person parenting Destiny for the previous 5 years.

---

[2] Neb. Rev. Stat. § 43-2922 (Reissue 2016).

Tina admits that she was not a stable or fit parent until 2016 and claims that she became so prior to the filing of her motion to modify custody. That raises the question whether Tina made adequate improvements in her parenting abilities and personal situation to merit a finding of fitness. The record clearly shows she has not done so. Tina has chosen to allow nearly all parenting duties and related financial obligations to remain with Jo, even when she had the ability to do otherwise. Tina has not exercised the many opportunities she has had to become involved in caring for Destiny or fulfilling her parenting functions.

Although Tina testified she could provide insurance for Destiny through her work, Tina had not made any effort to put Destiny onto her health insurance plan or to engage Destiny's medical or dental providers. Tina also admitted that she has never contacted Destiny's school to attend parent-teacher conferences, inquire about grades, or be involved with her extracurricular activities.

Tina attended one counseling session with Destiny, and that one session was enough to raise several concerns for the therapist. Tina demonstrated an unwillingness to be attentive to Destiny's feelings and concerns. The therapist testified that Destiny felt intimidated by Tina to the point that Destiny could not express to Tina that she does not want to live with her.

During her incarceration and for a short time thereafter, Tina attempted to address her addiction issues but stopped once she had met her court-ordered minimum requirements. Tina testified that she believes she is no longer an addict and that due to that fact, she has not voluntarily pursued an aftercare plan or chosen to further address her risk of relapse.

I do not believe that a parent is fit when he or she has shown a pattern of drug abuse, which leads to dangerous criminal behavior, and yet refuses to acknowledge the potential of relapse and take preventative measures. I believe that Tina's repeated choices to use and sell dangerous and illegal drugs has demonstrated a personal deficiency that has and will continue

to prevent performance of her reasonable parental obligations. Such conduct has been a detriment to Destiny's well-being and will likely continue to be so in the future.[3]

I agree with the district court that it would be in Destiny's best interests to remain with Jo. However, my position is based upon the fact that there was sufficient evidence in the record on which to find that Tina was unfit to parent Destiny. Unfortunately, this court cannot review what I believe to be the district court's mistaken findings of Tina's parental fitness, because it was not challenged upon appeal. Therefore, I must concur in the majority's conclusion that this matter should be remanded for further proceedings to determine whether "exceptional circumstances" exist as that phrase is now articulated.

HEAVICAN, C.J., joins in this concurrence.

_____

[3] See *In re Guardianship of K.R.*, 304 Neb. 1, 932 N.W.2d 737 (2019).