IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

TURNER V. TURNER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

CHELSEA TURNER, APPELLEE,

V.

SAMUEL TURNER, APPELLANT.

Filed November 10, 2025.    No. A-24-814.

Appeal from the District Court for Dawes County: TRAVIS P. O'GORMAN, Judge. Affirmed.

Adam R. Little, of Nebraska Legal Group, for appellant.

Amanda M. Vogl, of Douglas, Kelly, Ostdiek, Snyder, Ossian and Vogl, P.C., for appellee.

RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

MOORE, Judge.

## INTRODUCTION

Samuel Turner appeals from the order of the Dawes County District Court that modified the decree of dissolution to award Chelsea Turner sole custody of the parties' minor children and suspend Samuel's parenting time. Finding no abuse of discretion, we affirm.

## BACKGROUND

The parties' marriage was dissolved by a decree of dissolution entered by the district court on June 17, 2021. Both parties were self-represented at the final hearing and apparently stipulated to a parenting plan; however, the plan is not included in our record. The decree awarded the parties joint legal and physical custody of their children and approved the parenting plan. The decree also recited that "[g]iven the joint custody arrangement and the agreement of the parties, neither party is ordered to pay child support." Testimony at the modification trial indicated that Chelsea had parenting time Wednesday morning until Sunday morning and Samuel had parenting time Sunday

- 1 -

morning until Wednesday morning. On June 25, Chelsea filed, through counsel, a motion to alter or amend or for new trial, requesting that the court award her child support. This motion was denied by the district court on July 15.

On October 12, 2021, Chelsea filed a complaint to modify, seeking modification of the physical and legal custody, parenting time, child support, and tax exemptions. Samuel filed an answer and counterclaim. Samuel sought an order modifying holiday parenting time, prohibiting Chelsea from recording conversations between Samuel and the children, granting Samuel a first right of refusal to provide childcare when Chelsea cannot provide such care, ordering Chelsea to allow Samuel's ordered parenting time even if their son says he does not wish to go, and prohibiting Chelsea's mother from transporting the children.

On February 10, 2022, the district court entered an order denying temporary modification of the parenting plan but ordering that the children be placed in individual counseling with Chelsea to pick the counselor. On May 6, the court entered an ex parte order granting Chelsea sole legal and physical custody of the children and ordering that Samuel not have any contact with the children on a temporary basis. Another order was entered on May 12, following a hearing, which again granted Chelsea's motion for temporary custody, and suspended Samuel's parenting time pending further investigation into the allegations made.

The children were subsequently interviewed by the Department of Health and Human Services and the Chadron Police Department at an advocacy center in relation to allegations presented at the time of the temporary hearing in May 2022. In September, the district court appointed a guardian ad litem (GAL) to "ensure the best interests of the children." At Chelsea's request, the district court set the matter for trial on July 13, 2023. Following his counsel's withdrawal from representation, Samuel filed a motion to continue the trial, which was denied.

Trial proceeded on July 13, 2023. In addition to the parties, testimony was received from Dr. Catherine Jones-Hazledine, a licensed clinical psychologist; Sarah Parker, a provisionally licensed mental health practitioner; and Rhonda Flower, the GAL. Numerous exhibits were also received into evidence.

Jones-Hazledine owns a mental health practice, Western Nebraska Behavioral Health; has a Ph.D. in clinical psychology; and she specializes in working with children, adolescents, and families. Parker has been with this clinic since 2019 under the supervision of Jones-Hazledine; first as a practicum student, then an intern, and now as a provisionally licensed mental health provider (PLMHP). A PLMHP is a mental health provider who has completed all of the requirements for their education and is required to accrue 3,000 hours of supervised service provision.

Both children were referred to the clinic in February 2021 and they became patients of Parker. Jones-Hazledine met with the children in April 2022 to conduct a mental status examination in order to verify a medical need for services, the current diagnosis, and the treatment plan. She concurred with Parker's diagnosis for the son of adjustment disorder with mixed disturbance of emotions and conduct. With regard to the daughter, Jones-Hazledine concurred with the diagnosis of adjustment disorder unspecified, as the daughter's presenting symptoms did not "neatly fit into one specific category," although she had symptoms of anxiety and bedwetting. Jones-Hazledine testified that specific concerns regarding the daughter, in addition to her

bedwetting, were her fear of bathrooms, and her "unusual" behavior that appeared to be masturbation. A video recording of this activity was received in evidence.

Jones-Hazledine met at least weekly with Parker to discuss the status of the children's therapy. Because the concern of sexual abuse had been raised regarding the daughter, Parker and Jones-Hazledine talked at length about how to responsibly handle the issue. In reviewing Parker's therapy notes, Jones-Hazledine thought Parker approached the subject in an appropriate, careful manner.

Parker testified about her work as a PLMHP, specializing in trauma and abuse. As a provisionally licensed mental health therapist, she is fully licensed to practice under supervision. She has been seeing patients since she started her practicum in the fall of 2019. Chelsea initially sought counseling services for the children in February 2021, and Parker talked with her by phone about her concerns. Parker knew who Chelsea was before this as Parker was a graduate assistant for an online college class that Chelsea was enrolled in, but they had not met in person. Parker met Chelsea when she brought the children in for therapy; she separately met Samuel at the clinic. Parker initially met with each child once per week for 30 minutes; sessions were later reduced to biweekly.

Parker noted that both children initially shared that Samuel yelled at them a lot and "would get really scary." After about 3 months of therapy, the daughter disclosed to Parker that she had seen her dad hit her brother and that her dad had touched her in "inappropriate" places with his fingers and with his penis. Specifically, the daughter told Parker that her dad touched her vagina checking for a rash. The daughter further stated that her dad touched her with his finger in her rectum and touched her in her vagina and rectum and on her forehead with his penis. During the session before this disclosure, Parker indicated that the daughter told her that there were things she wanted to tell Parker but she was afraid she would get in trouble. After the disclosure, Parker indicated that the daughter took "a giant breath" and wanted to be done talking. Additionally, the daughter told Parker that the abuse began before her parents separated and the first time it occurred in her dad's basement bathroom. It then moved to a different bathroom and it happened during bath time.

After about 6 months of therapy, the son also disclosed that his dad was physically violent with him. Parker noticed a change in demeanor in both children when their father was mentioned in that they became fearful. The daughter told Parker that her dad said she would be in trouble if she told anyone, including her mother, about what went on at his house. Parker did not have any concerns that the children were being coached by Chelsea and Parker did not report what the children were saying to Chelsea.

Parker testified that once the parenting time with their father stopped, the children's fear started to lessen. They told Parker about running into their dad at a local store and said it was scary, but once he moved out of town, Parker indicated there was no more fear and the children's progress "skyrocketed." The daughter was no longer afraid to use the bathroom, which reinforced for Parker that it was more likely that the daughter was telling the truth about what happened in the bathroom with her father. Parker opined that based upon her observations over the year and a half that she has been working with the children, they are not lying.

Parker was given a video by Chelsea that showed the daughter engaging in a humping motion while lying on the floor. When Parker asked the daughter about it, she said her dad showed

her a video on YouTube of people doing that. The daughter told Parker that her dad would make her do this, and that he would sit on the couch behind her watching. The daughter said that she was embarrassed if her mom came into the room and saw her doing it, and that it felt good on her legs.

After the daughter's disclosure, Parker made a mandatory report to the child abuse hotline. Thereafter, she updated the treatment plans for the children to adjust their therapy goals. Parker noted that treatment is more complex when abuse has been perpetrated by a parent. At one point, the daughter expressed to Parker that she still wanted to see her dad, and "maybe he won't touch me with his penis anymore." However, as therapy progressed, and the children started to feel safer, they indicated that they didn't want to see their dad again. Parker testified that after Samuel left town, "[the children's] fear was gone, their personalities have come out 100 percent, and they're happy kids." Parker indicated that she would have concerns about the children backsliding in their progress if they had contact with their father.

Chelsea lives with her two children and her significant other, who she has been in a relationship with for almost 2 years. At the time of trial, the son was 10 years old, and the daughter was 7 years old. They have lived in Dawes County since 2017. At the time of trial, Chelsea was employed as a licensed student counselor at a college. She has medical, dental, and vision insurance for the children through this employment. Chelsea also maintains a small virtual private counseling practice.

Chelsea testified that at the time the parties agreed to the initial parenting plan, they were able to amicably coparent. She agreed that she had never seen Samuel abuse the children during the marriage. Shortly after the divorce, Chelsea became concerned about certain behavior in the children. The son exhibited a significant fear of transition days and going with his dad. The son would tell Chelsea that he was "scared his dad was going to punch him." According to Chelsea, the son started sleeping with a baseball bat under his bed and would lock all the doors and windows, stating he was "dad-proofing" the house. Chelsea testified that the daughter would consistently come home from parenting time with Samuel with her hair matted, frequently without underwear. The daughter developed multiple rashes on her legs and up her backside, which caused her pain "to the point to where she was screaming because they hurt so bad." According to Chelsea, the daughter cried when she sat in the bath, and she told Chelsea that it burned when she urinated.

Chelsea's concerns worsened over time. In particular, Chelsea witnessed the daughter's humping activity on the floor, which Chelsea had never seen her do before. Chelsea described that this activity "was so strenuous that [the daughter] was sweating and out of breath and would be so embarrassed and run and hide after she saw that somebody was watching her." According to Chelsea, this behavior happened almost daily when the daughter lay down in front of the TV. Chelsea recorded one of these incidents in April 2022. Chelsea gave the video to Parker as she was concerned that it showed sexualized behavior, but she didn't want to jump to conclusions or make accusations if it was typical child behavior. Chelsea also testified that the daughter developed an extreme fear of restrooms, and the son did as well at some point. According to Chelsea, none of these behaviors occurred prior to the divorce. With respect to the daughter's bedwetting, Chelsea indicated that they had "been free of Pull-Ups" for quite some time at her house, but the daughter would wet the bed after being with Samuel on Wednesday nights.

Chelsea testified that in May, Parker advised her that something had happened in therapy that required her to report to "CPS" and Parker indicated that the disclosure was sexual in nature. Thereafter, Chelsea was contacted by "somebody from the [S]tate" who told her not to send the children back with their father. This prompted Chelsea to reach out to her attorney to obtain the ex parte order.

After obtaining temporary custody and the cessation of Samuel's parenting time, Chelsea has seen incredible progress in the children's behavior. The son has a firm grasp on how to acknowledge his anger and use coping skills. The daughter's bedwetting and sexualized behavior significantly decreased and have essentially disappeared. Chelsea agreed that before Samuel moved out of Chadron, the few times the children would see him around town caused the children "pretty significant" distress.

Chelsea denied that she asked the children about what happened at their father's house or in any way attempted to lead or coach them. She first learned of their disclosure of abuse when Parker asked her to come into a session with the children in the fall of 2022. The daughter told Chelsea that her father was touching her "privates" and pointed to her vagina and rectum. The daughter was very quiet and afraid to talk about the abuse. The son has been more vocal about the physical abuse he experienced from his father.

In addition to requesting that she be awarded physical and legal custody of the children, Chelsea requested that Samuel not be granted any parenting time. She testified that "these kids have spent the last almost year and a half healing and processing from the abuse they endured from their dad, and I think reintroducing them to him at this point would absolutely retraumatize them." Chelsea also shared that the children have said multiple times that they never want to see Samuel again.

Rhonda Flower, a licensed attorney, was the court-appointed guardian ad litem for the children. As part of her investigation, she met with both parents and the children, and she talked to the therapists. She reviewed depositions, affidavits, and therapy notes, and she watched the CAPstone interviews of the children. She noted that there were three such interviews of each child over an 11-month period. These interviews were not made part of our record.

Flower met with each child separately. The son was very willing to share with her and had a lot to say. He made disclosures to her that were similar in nature to those he made to Parker. The son told Parker that "winning" would mean that he would never have to see his father again. The daughter was a little more reserved and quieter, but she quickly opened up and also made disclosures to her that were similar in nature to those she made to Parker. Specifically, the daughter indicated that her father had touched her below the waist where he should not have touched her, and she said it took place in the bathroom drying off after a bath. Flower did not see anything in her interview with the daughter that led her to believe she was lying or that she had been coached. Likewise, Flower did not see any indication that Parker was leading the son to make the disclosures. Flower did note inconsistencies in the children's reporting to CAPstone and the therapists; however, she indicated that such was not uncommon when young children reveal abuse. Despite the inconsistencies, Flower recommended deferring to Parker, who was adamant that abuse occurred and that the children should not have contact with Samuel at the present time. In her report, received in evidence, Flower recommended that if there was any contact between

Samuel and the children moving forward, it should be in a therapeutic setting and not move beyond that until there is a recommendation by the therapist.

Samuel remained self-represented at trial. Throughout his examination of the foregoing witnesses, Samuel suggested that Chelsea had coached the children to claim that he abused them. Samuel testified that he has never hurt his children, and he denied the allegations of abuse. Samuel testified that when the family was together, he was involved in the children's lives; he "fed them, taught them, played with them." He testified about the various activities he did with the kids. In February 2023, Samuel moved from Chadron to Kimball as part of a transfer with his employment. He was fired from this job shortly thereafter and obtained different employment in Kimball. He has since taken another job in Cheyenne, Wyoming, but continued to live in Kimball. He indicated that it was hard to see his children in Chadron and not be able to interact with them.

The court did not allow Samuel to call two other witnesses, due to his failure to timely disclose them through discovery. The parties rested and the court took the matter under advisement.

Prior to making a final determination regarding custody and parenting time, the court entered an order on August 21, 2023, requiring Samuel to undergo a psychosexual evaluation and Chelsea to undergo a full psychological evaluation. The court noted the allegations of sexual abuse perpetrated on the parties' daughter by Samuel, and the GAL's report opining that "any future contact with Samuel be limited to a therapeutic environment with the children's counselor/therapist and that visits not progress beyond the therapeutic setting until such time and under such conditions as dictated by the children's therapist." The court ordered that pending receipt of the evaluations and a further status hearing, temporary legal and physical custody would remain with Chelsea, and Samuel would have no parenting time.

The court set the completion of trial for July 23, 2024. Samuel remained self-represented at that hearing. At the beginning of the hearing, the district court stated that "[t]his isn't a trial; we've already had the trial. I ordered psychological testing on both sides, so that's what's admissible here is what the psychological testing showed. Anything that's happened since the trial – we're not going to rehash everything that could've been brought up at the time of the original trial. . ." The court received as exhibits the evaluations of Chelsea and Samuel.

Chelsea underwent a forensic psychological evaluation with Dr. Anne Talbot in December 2023 and January 2024. She was diagnosed with adjustment disorder with anxiety associated with situational stressors involving reasonable concerns for the safety and well-being of her children. Chelsea understood this diagnosis to indicate that "there is a big life event that happens and you have a very difficult time adjusting to the changes that come with that big life event." Chelsea indicated that the abuse allegations that the children made led her to seek counseling with Jeanna Townsend in June or July 2022. Townsend made the same diagnosis as Talbot. The evaluation found Chelsea to have no significant mental health impairment, or difficulty, no mood or personality disorders, and found that Chelsea was a "safe and effective parent likely to have appropriate concerns for the safety and well-being of her children without an intention to subvert or undermine their relationship with their other parent without reasonable provocation."

Samuel underwent a psychosexual evaluation with Diane Guerra, PsyD, in January 2024. She noted the difficulty in applying risk factors in this case since Samuel had not been charged with a crime. Given the variables, Guerra determined that Samuel "presents as a lower risk for

committing a sexual offense"; however, she noted that the risk prediction or assessment was limited and cautioned that one should not confuse the finding with a determination of guilt or innocence.

After reviewing Samuel's evaluation, Chelsea testified that she did not believe Samuel has taken responsibility for his actions, that he omitted information, and he was attempting to deflect the blame throughout the evaluation. For example, Chelsea testified that Samuel did not disclose that he was fired from a job at a fitness center for sexually assaulting a male patron and also lost his position at Chadron State College for sexually harassing female student athletes.

Chelsea expressed concern about Samuel's evaluation's high score indicating that he enjoyed exposing himself to other people. This concerned Chelsea in light of the daughter's description that Samuel would force her to watch pornographic material and make her engage in "that humping motion" that Samuel would then watch. Chelsea was also concerned that the evaluation indicated Samuel had sexual interests that included juvenile females, although we note that the evaluation did not consider this to be a deviant sexual interest. Chelsea also testified about Samuel's sexual preferences described in the evaluation, which Chelsea thought showed a pattern of deviancy. Chelsea was alarmed by Samuel's statements about women often falsely accusing men of rape, which Chelsea believed was consistent with his denial of the daughter's disclosure of his sexual abuse of her. Finally, Chelsea expressed concern about the evaluation's disclosure of Samuel's past substance and alcohol use and his financial instability.

Chelsea testified about Samuel's attempts to contact the son through another child at the son's school. Chelsea indicated that the son was very upset by this and told her that "he just wants to never think about his dad again and he wishes his dad would go to prison." Chelsea stated that the daughter has made similar comments about not wanting to have contact with her dad, and wishing "her dad would die."

Chelsea testified that the children continue to counsel with Parker every other week. The children are doing very well in school and are engaged in many activities. According to Chelsea, the children's level of fear and anxiety has decreased since Samuel moved and since the last trial. However, they still have a fear that Samuel may try to kidnap them. Chelsea believes that it would "destroy" the children if Samuel were allowed to see them. Chelsea indicated that she only talks to the children about what happened to them if they bring it up. The son has disclosed to Chelsea that he witnessed Samuel selling drugs and that Samuel used to hit him a lot, giving him bloody noses. The daughter disclosed to Chelsea that Samuel touched "her privates." The daughter told Chelsea that when she is older and ready, she wants to press charges, but she is not ready now because she's scared. Both children have "been very clear that they don't want to have anything to do with [Samuel]" and "never want to see him again. They're terrified at the idea of ever having to be in the same room with him."

Samuel cross-examined Chelsea, and the district court limited his questions to those relating to the evaluations and the circumstances since the last trial. Samuel asked about Chelsea's previous health history regarding a possible stroke and suffering from anorexia. Chelsea responded that she was never clinically diagnosed or treated for either condition, so those diagnoses were not included in the evaluation. She did disclose in the evaluation that she had suffered from body image issues when she was younger.

At the time of the continued hearing, Samuel was working as an insurance agent and was licensed in Nebraska. Samuel admitted that he had engaged in sexual behaviors he regretted. He agreed that the evaluation noted his risk factors as including being accused of sexual abuse, being a victim of abuse, witnessing domestic violence, starting a fire as a child, school suspensions, family history of criminal involvement, and a history of substance use. He admitted that he did not disclose being fired from two jobs for reasons related to sexual harassment. Samuel has not engaged in counseling as recommended in the evaluation, although he did attend four or five sessions in 2021 after the divorce.

Parker testified and indicated that she is now a licensed mental health practitioner. She has continued to see the children since the trial in July 2023. Parker indicated that the children are doing much better with coping skills and are not as emotionally dysregulated. As a result, they have decreased their sessions to biweekly. Parker has updated their diagnoses; both children have been diagnosed with post-traumatic stress disorder. The daughter has a secondary diagnosis of child sexual abuse and the son has a secondary diagnosis of child physical abuse. In their sessions since the trial, the children typically don't discuss their father; if he is mentioned, they shut down, which Parker indicated is a trauma response. The children have also said, "I never want to see him again." Turner testified that she would have concerns with the children resuming contact with Samuel. She indicated that the children have gone from "really afraid, hypervigilant kids" to "healthy, happy, adjusted kids." Parker testified, "that would all be gone the second they were around him. And anything I've taught them, any of the coping skills that they've learned and utilized would all be gone because that's the nature of PTSD, especially in children." Based upon her training, experience, and working with the children, it was Parker's recommendation that the children not resume any parenting time with Samuel. Parker indicated that based on what the children have disclosed to her and her observations of them, they should never be alone with Samuel. If supervision were ordered, Parker recommended it be by a person trained to see signs of abuse and manipulation and grooming. Parker testified that she has never seen evidence to suggest that Chelsea has coached or groomed the children in connection with their disclosures. Parker agreed that early on in counseling, the children expressed mixed emotions about their father; both anger and sadness. However, Parker indicated that there is no mixture anymore.

At the conclusion of the hearing, the court received in evidence a written statement from Samuel.

On October 7, 2024, the district court entered its final order. The court found it to be in the best interests of the children that Chelsea be granted sole legal and physical custody of the children. The court also found that the best interests of the children require that Samuel have no parenting time "at this time." The court specifically found Parker's testimony credible with respect to the effect forcing visitation could have on the children. The court stated its belief "that forcing visitation would pose a significant risk to the children's emotional and physical well-being." Samuel was ordered to pay $500 in monthly child support and Chelsea was allowed to claim both children each year for income tax purposes.

Samuel appealed and is represented by counsel on appeal.

ASSIGNMENTS OF ERROR

Restated, Samuel assigns that the district court abused its discretion by (1) unconstitutionally denying him all rights to be involved in his children's lives, (2) placing an absolute bar on his parenting time, because there was not a preponderance of the evidence that exceptional circumstances existed to merit such significant measures, (3) constructively terminating his parental rights without affording him the due process protections afforded under a statutory termination proceeding, (4) placing significant weight on unqualified expert testimony, and (5) impermissibly permitting Chelsea to collaterally attack an expert's report where she was not qualified to do so. Samuel also assigns that the district court violated his procedural due process rights by denying him the opportunity to be fully heard on the second day of trial.

STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record and will be affirmed absent an abuse of discretion. *Sulzle v. Sulzle*, 318 Neb. 194, 14 N.W.3d 532 (2024).

A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *Mann v. Mann*, 316 Neb. 910, 7 N.W.3d 845 (2024). When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

The determination of whether procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *Id*.

ANALYSIS

*Denial of Parenting Time/Constructive Termination of Rights.*

In this modification proceeding, the district court found that Chelsea met her burden of proving a material change in circumstances, awarded her sole legal and physical custody of the children, specifically ordered that Samuel not have any parenting time, and modified child support. Samuel argues that the district court abused its discretion by "unconstitutionally denying [him] all rights to be involved in his children's lives" and by placing an "absolute bar" on his parenting time. He argues that there was not sufficient evidence that "exceptional circumstances exist to merit such significant measures." Brief for appellant at 8. He further argues that the court's order amounted to a constructive termination of his parental rights.

Ordinarily, the party seeking modification of a dissolution decree has the burden to produce sufficient proof that a material change of circumstances has occurred that warrants a modification. See, *Mann v. Mann, supra; Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021). Modifying a custody or parenting time order requires two steps of proof. *Mann v. Mann, supra*. First, the party

seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. *Id*. Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests. *Id*. Generally speaking, a material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior modification, would have persuaded the court to decree differently. *Id*.

Samuel does not specifically argue that the district court erred in finding that a material change in circumstances has occurred since entry of the decree. In our de novo review, we find no abuse of discretion in the district court's conclusion that a material change in circumstances had occurred since the entry of the decree, primarily as a result of the disclosure of physical and sexual abuse by the children occurring after the divorce.

Although Samuel focuses primarily on his rights as a parent, he essentially challenges the court's finding that it was in the best interests of the children to deny him parenting time. When deciding custody issues, the court's paramount concern is the child's best interests. *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018). The Nebraska Parenting Act, specifically Neb. Rev. Stat. § 43-2923 (Reissue 2016), provides that the best interests of the child require:

> (1) A parenting arrangement and parenting plan or other court-ordered arrangement which provides for a child's safety, emotional growth, health, stability and physical care and regular and continuous school attendance and progress for school-age children;
>
> . . . .
>
> (3) That the child's families and those serving in parenting roles remain appropriately active and involved in parenting with safe, appropriate, continuing quality contact between children and their families when they have shown the ability to act in the best interests of the child and have shared in the responsibilities of raising the child.

Further, § 43-2923(6), provides that "[i]n determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of foregoing factors" and:

> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (      c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member[;] and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. See *Kashyap v. Kashyap, supra*. The best interests of a child

require a parenting plan that provides for a child's safety, emotional growth, health, stability, physical care, and regular school attendance and which promotes a child's continued contact with his or her families and parents who have shown the ability to act in the child's best interests. See *Chmelka v. Chmelka*, 29 Neb. App. 265, 953 N.W.2d 288 (2020).

Parents have a fundamental right to make decisions concerning the care, custody, and control of their children that is constitutionally protected. *State on Behalf of Tina K. v. Adam B.*, 307 Neb. 1, 948 N.W.2d 182 (2020). Establishment and continuance of the parent-child relationship is the most fundamental right a child possesses to be equated in importance with personal liberty and the most basic constitutional rights. *Id*.

A decree awarding one parent the custody of a child should, under normal circumstances, include a provision permitting the noncustodial parent visitation with the child under such conditions and in such manner as the circumstances may warrant, and only under exceptional circumstances should that right be totally denied. *Sulzle v. Sulzle*, 318 Neb. 194, 195, 14 N.W.3d 532, 536 (2024). There is a strong presumption in favor of visitation, and the right of access to one's children should not be denied unless the court is convinced such visitations are detrimental to the best interests of the child. *Id*.

In *VanSkiver v. VanSkiver*, 303 Neb. 664, 930 N.W.2d 569 (2019), the Supreme Court modified the order to suspend all of the father's scheduled parenting time because the suspension of visitation with the children was justified. The district court's order in *VanSkiver* stated that the children could decline visitation with the father that was set forth in the parenting plan and that no overnight visitations would take place until the father engaged in individual mental health counseling and then counseling with the children, after which he could petition the court for additional parenting time. In support of the order, the district court found that the children were at risk for mental abuse during visitation and expressed its intent that the order would allow the children to see their father at their discretion. The Supreme Court modified the order to suspend all of the father's scheduled parenting time, explaining that is what the trial court intended.

Here, the district court did not make a specific finding regarding Samuel's fitness and did not terminate his parental rights. Rather, the district court found that the best interests of the children require that Samuel not have contact with them "at this time." The record supports this conclusion. The district court found Parker's testimony to be credible, thus accepting her opinion that it would be contrary to the children's best interests to have any contact with their father based upon the trauma they have experienced as a result of abuse. The district court made an implicit finding that Chelsea proved exceptional circumstances showing that any visitation with Samuel at this time would be detrimental to the best interests of the children.

The district court's order does not preclude Samuel from seeking contact with his children through a modification proceeding should circumstances change in the future. The right of parenting time is subject to continual review by the court, and a party may seek modification of a parenting time order on the grounds that there has been a material change in circumstances. *Weaver v. Weaver, supra*.

We find no abuse of discretion in the denial of parenting time to Samuel in the modification order. Samuel's parental rights were not terminated and his constitutional rights were not violated.

*Weight Given to Expert Testimony.*

Samuel argues that the district court gave improper weight to Parker's unqualified expert testimony. The district court specifically found that Parker's testimony was credible with respect to the effect forcing visitation could have on the children. The court stated its belief that forcing visitation would pose a significant risk to the children's emotional and physical well-being.

A trial court weighs the credibility of the witnesses and the evidence and determines what evidence should be given the greater weight in arriving at a factual determination on the merits. See *Weston v. Weston*, 32 Neb. App. 822, 7 N.W.3d 230 (2024). In doing so, a trial court may choose what evidence merits greater weight. *Id*. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Backhaus v. Backhaus*, 318 Neb. 891, 20 N.W.3d 81 (2025).

Parker testified to her education and qualifications. Although she had just recently completed her requirements under her provisional license and received her full license, we find no abuse of discretion in the district court's acceptance of her testimony as a qualified expert. In our de novo review, we give weight to the fact that the trial court heard and observed the witnesses and accepted Parker's testimony as credible. This assigned error fails.

*Collateral Attack on Expert Report.*

Samuel asserts that Chelsea's testimony regarding her review of Samuel's psychosexual evaluation should be disregarded as she was not a qualified expert witness. It is clear from the record that Chelsea's testimony was not being offered as expert opinion testimony but rather was being offered as her personal observations. There is no indication that the district court based its decision on Chelsea's testimony regarding Samuel's evaluation. Samuel did not object to Chelsea's testimony in this regard and we find no abuse of discretion in the trial court's receipt of Chelsea's testimony.

*Procedural Due Process.*

The U.S. and Nebraska Constitutions provide that no person shall be deprived of life, liberty, or property without due process of law. *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020). Due process does not guarantee an individual any particular form of state procedure. *Id*. Instead, due process requires that parties at risk of the deprivation of liberty interests be provided adequate notice and an opportunity to be heard, which are appropriate to the nature of the proceeding and the character of the rights that might be affected. See *id*. This has been referred to as the people's right to their "day in court." *Id*.

Samuel argues that his due process rights were violated when he was denied the opportunity to be fully heard on the second day of trial. As indicated above, the district court limited the evidence at the July 23, 2024, continued hearing to evidence relating to the evaluations and testimony regarding matters occurring after the first day of trial in July 2023. Samuel did not object to this limitation at the commencement of the second hearing. Samuel was able to fully cross-examine Chelsea and Parker. When asked whether he had evidence he wanted to offer that he hadn't already covered, Samuel stated, "because -- I guess I was not aware we weren't allowed to speak on things prior to the last hearing and things [Chelsea] discussed and left out of her

evaluation, I'm not calling any more witnesses today." Contrary to the latter assertion, Samuel did cross-examine Chelsea at length about matters he felt she did not disclose in her evaluation. Regarding other matters that occurred prior to the last hearing, Samuel was afforded an opportunity to present his evidence at the initial trial. The trial was only continued as a result of the district court's order for further evaluations. Finally, Samuel offered his written statement at the conclusion of the second hearing, which was received into evidence. This statement did include information about matters which predated the first trial.

We find no violation of Samuel's due process rights. This assigned error fails.

### CONCLUSION

We find no abuse of discretion by the district court in modifying the decree of dissolution to award Chelsea sole legal and physical custody of the children and in determining that Samuel should have no parenting time "at this time." The district court did not abuse its discretion in finding Parker to be a credible witness and in allowing Chelsea to testify at the continued hearing to her concerns following Samuel's evaluation.

AFFIRMED.